RECEIVED
IN MONROE, LA
AUG 1 1 2008
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| LOUISIANA ENVIRONMENTAL ACTION NETWORK | CIVIL ACTION NO. 07-0595 |
| VERSUS | JUDGE ROBERT G. JAMES |
| LWC MANAGEMENT CO., INC., ET AL. | MAG. JUDGE KAREN L. HAYES |

## RULING

Before the Court is a motion for summary judgment [Doc. #78] filed by plaintiff Louisiana Environmental Action Network ("LEAN"). Because LEAN has failed to meet its burden of establishing that it has Article III standing, the motion is DENIED.

### I.  Facts and Procedural History

In this lawsuit, LEAN is suing the owners and operators of five sewage treatment facilities. LEAN alleges that the defendants have chronically discharged sewage pollution into the waterways of northern Louisiana in violation of the Clean Water Act ("CWA") and their permits. In the instant motion, LEAN seeks summary judgment against defendants LWC Management CO., Inc. ("LWC") and Louisiana Land and Water Company, Inc. ("Louisiana Land and Water") on the issue of liability for discharge and reporting violations. Also named in the suit are defendants John Jeffrey Pruett, UDS Management Corp., Utility Data Service Corp., and Bayou Utilities, Inc.

Louisiana Land and Water purchased the sewage facilities for the Love Estates, Presidential Estates, and Milhaven Estates subdivisions in June 2003 (respectively the "Love

Estates facility," "Presidential Estates facility," and "Milhaven Estates facility"). [Doc. #78 - Ex. 1]. LWC operates each of the facilities owned by Louisiana Land and Water. [Doc. #78 - Ex. 5 - 6]. Louisiana Land and Water owns and LWC operates the other two sewage facilities at issue in this case as well: The treatment facility for the Mt. Carmel-Maplewood subdivision ("Maplewood facility") and the treatment facility for the Tanglewood Estates subdivision ("Tanglewood Estates facility"). [Doc. #78 - Ex.7].

## II. Law and Analysis

### A. Summary Judgment Standard

Summary judgment is appropriate when the evidence before the Court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(b). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Anderson, 477 U.S. at 247). "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential

elements of the claim or defense to warrant judgment in his favor." Fontenot v. Upjohn Co. 780 F.2d 1190, 1194 (5th Cir. 1986). If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. Norman v. Apache Corp., 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. Anderson, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the nonmoving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." Little v. Liquid Air. Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

### B. Violation of Effluent Standard or Limitation Under the CWA

"Congress passed the [CWA] in 1972 with the stated purpose of restoring and maintaining the integrity of the nation's waters." Carr v. Alta Verde Indus., 931 F.2d 1055, 1058 (5th Cir. 1991) (citing 33 U.S.C. § 1251(a)). "To achieve this goal, the [CWA] requires the strict enforcement of certain technology-based effluent limitations." Id. "As the primary means for enforcing these effluent limitations, Congress established the NPDES permit system." Id. "In order for any person lawfully to discharge any pollutant from a point source into navigable waters of the United States, that person must obtain an NPDES permit and comply with its terms." Id. (citing 33 U.S.C. § 1311(a)). In Louisiana, the issuance of permits has been delegated to the Louisiana Department of Environmental Quality, and the permits are termed Louisiana Pollutant Discharge Elimination System ("LPDES") permits.

In this case, LEAN has brought suit under the "Citizen Suits" provision of the CWA. See 33 U.S.C.A. § 1365(a)(1). Accordingly, LEAN's suit alleges that the defendants are "in violation of . . . an effluent standard or limitation." Id. "The term 'effluent limitation' means any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C.A. § 1362(11). "The term 'point source' means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged . . . ." 33 U.S.C.A. § 1362(14).

Violators of the CWA are subject to absolute and/or strict civil liability. United States v. Coastal States Crude Gathering Co., 643 F.2d 1125, 1127-28 (5th Cir. Unit A Apr. 1981). "[D]istrict courts have discretion to determine . . . how many violation days should be assessed for penalty purposes for the violation of a monthly average limit . . . ." Friends of the Earth v. Chevron Chem. Co., No. 1:94-CV-434, 2006 WL 887459, at *2 (E.D.Tex. Mar. 29 2006). The parties agree that the defendants' facilities are bound by the CWA; each facility has obtained a CWA permit.

LEAN has submitted the declaration of Mary Lee Orr, LEAN's executive director, who reviewed the DMRs and permits. [Doc. #78 - Ex.11]. "[C]ourts have long approved the use of reports or records which the law requires to be kept as admissions in establishing civil liability." Student Pub. Interest Research Group, Inc. v. P.D. Oil & Chem. Storage, Inc., 627 F. Supp. 1074,

4

1090 (D.N.J. 1986). Orr asserts that she "attached summary tables accurately summariz[ing] pertinent information contained in [the] DMRs." [Doc. #78 - Ex. 11, ¶ V]. Orr asserts that the DMRs summarized in her exhibits establish that the facilities routinely discharged pollutants in excess of the limits in the permits and therefore are in violation of the CWA. See 33 U.S.C. § 1311(a).

> Based on the DMRs summarized in Orr's findings, the plaintiffs contend that
> 
> The Maplewood Sewage Facility violated its permit limit for the monthly average of TSS for 38 months in the time period from January 2002 to December 2007. The facility has violated the monthly average BOD limit for 37 months during this time. The total number of days in violation of the TSS limit during the period equals 1,156. The total number of days in violation of the BOD limit equals 1,127.
> 
> . . .
> 
> The Tanglewood sewage facility violated its permit limit for the monthly average of TSS for 8 months in the time from January 2003 to June 2004. The facility has violated the monthly average BOD limit for 3 months during this time. These monthly average violations represent 243 days in violation of the permit limit for TSS, and 93 days in violation of the permit limit for BOD, totaling 336 days in violation.
> 
> . . .
> 
> The Love Estates sewage facility violated its permit limit for the monthly average of TSS for 37 months in the time period from June 2003 to December 2007. The Love Estates Sewage Facility violated its permit limit for the monthly average of BOD for 37 months in the time period from June 2003 to December 2007. These monthly average violations represent 1130 days in violation of the permit limit for TSS, and 1130 days in violation of the permit limit for BOD, totaling 2260 days in violation.
> 
> . . .
> 
> The Milhaven sewage facility violated its permit limit for the monthly average of TSS for 43 months in the time period from June 2003 to December 2007. The Milhaven sewage facility also violated its permit limit for the monthly average of BOD for 41 months in the time period from June 2003 to December 2007. These monthly average violations represent 1316 days in violation of the permit limit for

TSS, and 1255 days in violation of the permit limit for BOD, totaling 2571 days in violation

. . .

The Presidential sewage facility violated its permit limit for the monthly average of TSS for 15 months in the time period from April 2004 to December 2007. The Presidential sewage facility also violated its permit limit for the monthly average of BOD for 28 months in the time period from April 2004 to December 2007. These monthly average violations represent 460 days in violation of the permit limit for TSS, and 861 days in violation of the permit limit for BOD, totaling 1321 days in violation.

[Doc. #78-2, Ex. 11 ¶¶ 6, 10, 13, 16, 19; see also Doc. 78-2, Ex. 11 (attached tables)].

The defendants have neither denied these allegations nor offered evidence contradicting Orr's findings. As a result, no genuine issue of material fact exists; the court finds that the facilities violated their permit limits to the extent listed above.

### C. Standing

"The CWA confers standing to the limits of the Constitution. Under the CWA, 'any citizen may commence a civil action.' 33 U.S.C. § 1365(a). A 'citizen' is 'a person or persons having an interest which is or may be adversely affected.' § 1365(g)." Save Our Cmty. v. U.S. EPA, 971 F.2d 1155, 1160 (5th Cir. 1992).

Associations such as LEAN

have standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). The defendants do not dispute that LEAN satisfies the second and third prongs of this test: LEAN was established to promote and protect the health of Louisiana's natural environment for the use and enjoyment of

the people of Louisiana. [Doc. #78-11, ¶ 2]. Consequently, the standing of individual members of LEAN is what is at issue. In Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc., 454 U.S. 464, 472 (1982), the Supreme Court enunciated the requirements for individual standing:

> [A]t an irreducible minimum, Art[icle] III requires the party who invokes the court's authority to show that [1] he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and [2] that the injury fairly can be traced to the challenged action and [3] is likely to be redressed by a favorable decision.

(internal citations and quotation marks omitted).

"[E]ach element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" Bennett v. Spear, 520 U.S. 154, 167-68 (1997) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). LEAN submitted declarations from several of its members in its attempt to establish standing. [Doc. #78, Ex. 11-17]. Only one of these declarations must establish an injury in fact that is fairly traceable to the defendants' violations of the CWA to establish organizational standing. Sierra Club, Lone Star Chapter, 73 F.3d at 558. However, "a plaintiff must demonstrate standing separately for each form of relief sought." Friends of the Earth, Inc., 528 U.S. at 185 (2000). Accordingly, LEAN must have standing with regard to each facility alleged to have violated the CWA.

### 1. Injury in Fact

"The Supreme Court [has] held . . . that harm to aesthetic, environmental, or recreational interests is sufficient to confer standing, provided that the party seeking review is among the

7

injured." Save Our Cmty., 971 F.2d at 1161(citing Sierra Club v. Morton, 405 U.S. 727, 733 (1972)). Furthermore, "'these injuries need not be large, an 'identifiable trifle' will suffice.' " Id. (quoting Pub. Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3rd Cir.1990)). "The relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." Friends of the Earth, Inc., 528 U.S. 167, 181 (2000). The injury in fact requirement "is designed to limit access to the courts to those who have a direct stake in the outcome, as opposed to those who would convert the judicial process into no more than a vehicle for the vindication of the value of concerned bystanders." Sierra Club, Lone Star Chapter, 73 F.3d at 556 (internal citations and quotation marks omitted).

### a. Love Estates

LEAN member Rhoda Mims has lived in the Love Estates subdivision for approximately 28 years. In her declaration, Mims asserts that the pollution emanating from the sewerage treatment plant in the subdivision has polluted the neighborhood and has an offensive odor. Moreover, Mims asserts that due to the pollution her property value has depreciated and she does not let her granddaughter play outside anymore due to health-related concerns. [Doc. #78 - Ex.20]. These assertions establish that Mims has a direct stake in the outcome and has suffered an injury in fact.

### b. Maplewood

LEAN member Lois Rogers has lived in the Maplewood subdivision for approximately 11 years. Rogers lives approximately one half of one mile from the sewerage treatment plant in the Maplewood subdivision. Rogers asserts the sewerage treatment plant has caused raw sewerage to be emitted into the ditch in front of her house. [Doc. #78 - Ex. 13]. These assertions

8

establish that Rogers has a direct stake in the outcome and has suffered an injury in fact.

### c. Milhaven Estates

LEAN member Mike Davis has lived in the Milhaven Estates subdivision since 1994. Davis asserts that he lives approximately 50 yards from the sewerage treatment facility in that subdivision. Davis asserts that he is concerned about improperly treated sewage running in the ditches around the neighborhood. Davis further asserts that the sewerage emitted from the facility has forced him to stop taking walks in the neighborhood and to no longer allow his children to play in the area. [Doc. #78 - Ex.19]. These assertions establish that Davis has a direct stake in the outcome and has suffered an injury in fact.

### d. Presidential Estates

LEAN member Rebecca Young has lived in the Presidential Estates subdivision for approximately 10 years. Young asserts that she lives approximately one half of one mile from the sewerage treatment pond in the Presidential Estates subdivision. Young asserts that the water emits a terrible smell and that when it rains, the sewage backs up and comes into her yard. She asserts that she worries about the her health as well as that of her children. [Doc. #78 - Ex.21].

LEAN member Louis Felton has lived in the Presidential Estates subdivision since 1993. Felton asserts that he lives approximately 50 feet from the sewerage treatment pond in the same subdivision. Felton asserts that he can no longer enjoy being outside because of the smell emanating from the area. [Doc. #78 - Ex.18]. The assertions of Felton and Young have established that they have a direct stake in the outcome and have suffered an injury in fact.

### e. Tanglewood Estates

LEAN member John Sewell lives in the Tanglewood Estates subdivision. Sewell asserts

that the sewerage treatment pond in the subdivision, as well as the point from which the sewage discharges, are right behind his house. Sewell further asserts that the wastewater and untreated sewage have run from the sewerage treatment pond into the ditches in the neighborhood. Sewell asserts that the smell is horrible and permeates the community. [Doc. #21 - Ex. 3]. These assertions establish that Sewell has a direct stake in the outcome and has suffered an injury in fact.

### f. The Defendants' Arguments Against Injury In Fact

The defendants argue that the LEAN members do not live close enough to the discharge point to have suffered an injury in fact. [Doc. #81, p.15]. This contention is inconsistent with the manner in which courts have treated the injury in fact requirement. In Friends of the Earth, Inc., 528 U.S. at 181-82, for example, the Court found that a member of the plaintiff organization had suffered an injury in fact because he: (i) lived one half of one mile from the polluting facility; (ii) occasionally drove over the polluted area where he could see and smell the pollution; and (ii) he would have liked to fish, camp, swim, and picnic in the area. The Court reiterated that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Id. at 183.

The facts underlying the Friends of the Earth, Inc. Court's finding of injury in fact are very similar to those in this case. Most or all of the LEAN member declarants live within one half-mile from the area in which or from which the pollutants are being discharged. Each declarant has asserted facts establishing that the pollution emanating from the treatment facilities has adversely impacted their property interests, their community, and/or their enjoyment obtained

10

from being outside. These sworn statements adequately document injury in fact.

### 2. Causation

The Fifth Circuit Court of Appeals has applied a three-part test to determine whether an injury is "fairly traceable" to a defendant's pollutant discharge in a CWA citizen suit. E.g., Sierra Club, Lone Star Chapter, 73 F.3d at 557-58; Friends of the Earth v. Crown Cent. Petroleum Corp., 95 F.3d 358, 361 (5th Cir. 1996).

> According to this test, the plaintiff must 'show that a defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) **into a waterway in which the plaintiffs have an interest** that is or may be adversely affected by the pollutant and that (3) the pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs.'

Sierra Club, Lone Star Chapter, 73 F.3d at 557-58 (quoting Pub. Interest Research Group, 913 F.2d at 71) (emphasis added).

Here, the first and third elements are clearly met. As discussed above, the facilities in this case have discharged pollutants in concentrations greater than allowed by their permits. Moreover, the injuries alleged relate to the stench and presence of sewage, which is the pollutant discharged by the defendants.

Turning to the second element, it is not in dispute that the facilities discharge pollutants "into a waterway." The permit applications filed by the defendants indicate the names of the "receiving waters" that the effluent from the facilities will enter. E.g., [Doc. #78 - Ex. 2 (indicating that the Love Estates facility discharges effluent into the Patrick Bayou)]; see also [Doc. #78 - Ex. 3, 4, 8]. However, for the causation element to be satisfied, LEAN must establish that the waterway into which the defendant has discharged pollutants is one "in which the plaintiffs have an interest." In other words, the fact that individual LEAN members have an

11

interest in living in neighborhoods free of sewage does not necessarily satisfy the standing requirement for a suit under the CWA.

While each of the facilities emits wastewater that eventually spills into waterways, none of the declarants has indicated that they have an interest in *those* waterways. The declarations submitted by LEAN do not identify a single waterway in which the LEAN members purport to have an interest.[1] Instead, many of the declarants complain of the stench emanating from the sewerage treatment facilities, e.g., [Doc. #78 - Ex.19], the sewerage treatment ponds, e.g., [Doc. #78 - Ex.21], and the "ditches" in the neighborhoods. [Doc. #78 - Ex.13]. There is no evidence in the record establishing that the "ditches" to which the declarants refer constitute "waterways." Because the current state of the evidence in the record is insufficient to establish that the LEAN members have an interest in any waterway(s) into which the defendants have discharged pollutants, there remains a genuine material issue of fact as to whether any member of LEAN has suffered an injury which is fairly traceable to the defendants' discharge and reporting violations.[2]

---

[1] LEAN member Rhoda Mims is the only declarant to expressly name a waterway. Mims asserts that when she "visit[s her] friend on Barbara Drive, it bothers [her] to think that the pollution coming from the Love Estates' treatment pond is flowing in Patrick Bayou right behind her house." [Doc. #78 - Ex.20]. Although her interest in Patrick Bayou may be fairly traceable to the defendants' pollutant discharges, it is not clear that the discharge into Patrick Bayou constitutes an injury to Mims. See Sierra Club, Lone Star Chapter, 73 F.3d at 556 (the injury in fact requirement "is designed to limit access to the courts to those who have a direct stake in the outcome, as opposed to those who would convert the judicial process into no more than a vehicle for the vindication of the value of concerned bystanders.") (internal citations and quotation marks omitted). With regard to Patrick Bayou, Mims' declaration does not establish that she is anything more than a "concerned bystander." As a result, even if her declaration establishes causation, it is does not establish injury in fact with regard to the waterway and does not establish standing for either her or LEAN.

[2] The defendants contend that LEAN's interest must "fall within the 'zone of interests' protected by the [CWA]." See [Doc. #81, p.13]. This court need not address this contention as it (a) will not affect the conclusion that there is a genuine issue of material fact as to causation, and

12

Crown Cent. Petroleum Corp., 95 F.3d at 361 (holding that inability to show that injuries are fairly traceable to discharges entails a lack of standing for both discharge and reporting violations).

### 3. Redressability

While the defendants contend that LEAN has failed to establish both injury in fact and causation, they do not argue that LEAN has failed to establish redressability. See generally Friends of the Earth, Inc., 528 U.S. at 185-86 (holding that civil penalties under the Clean Water Act promote immediate compliance and deter future liabilities and therefore provide a form of redress); id. at 185 ("it is wrong to maintain that citizen plaintiffs facing ongoing violations never have standing to seek civil penalties."); Sierra Club, Lone Star Chapter, 73 F.3d at 556 (concluding that there was "no question that an injunction would redress injuries" caused by Clean Water Act violations).

### D. Notice

The "Citizen Suits" provision of the CWA provides in part:

No action may be commenced–

(1) under subsection (a)(1) of this section–

> (A) prior to sixty days after the plaintiff has given notice of the alleged violation
>
> . . .
>
> (iii) to any alleged violator of the standard, limitation, or order . . . .

---

(b) the argument seems to be based on a conflation of the standing requirements for Article III standing and statutory standing. See Sierra Club, Lone Star Chapter, 73 F.3d at 559 n.25 ("'Statutory standing' is an administrative law concept that arises in the context of challenges to agency actions in which a court must determine whether the interest sought to be protected is within the 'zone of interests' protected by the relevant statute.").

13

33 U.S.C. § 1365(b). The Code of Federal Regulations further informs the notice requirement:

> **If the alleged violator is an individual or corporation, service of notice shall be accomplished by certified mail addressed to, or by personal service upon, the owner or managing agent** of the building, plant, installation, vessel, facility, or activity alleged to be in violation. A copy of the notice shall be mailed to the Administrator of the Environmental Protection Agency, the Regional Administrator of the Environmental Protection Agency for the region in which such violation is alleged to have occurred, and the chief administrative officer of the water pollution control agency for the State in which the violation is alleged to have occurred. **If the alleged violator is a corporation, a copy of such notice also shall be mailed to the registered agent**, if any, of such corporation in the State in which such violation is alleged to have occurred.

40 C.F.R. § 135.2(a)(1) (emphasis added). Accordingly, there are two procedural requirements listed in the regulation, which will be considered in turn.

First, "[i]f the alleged violator is an individual or corporation, service of notice shall be accomplished by certified mail addressed to . . . the owner or managing agent." 40 C.F.R. § 135.2(a)(1). Here, Pruett is the president of each of the defendant corporations.[3] In addition, Pruett is the General Manager of each of the facilities. [Doc. #81 - Ex. I2 (DMRs for Love Estates); Ex. J2 (DMRs for Maplewood); Ex. K2 (DMRs for Milhaven Estates); Ex. L2 (DMRs for Presidential Estates); Ex. M2 (DMRs for Tanglewood Estates)]. LEAN sent notice via certified mail to Pruett regarding each of the facilities. [Doc. #20-1 (Tanglewood Estates); Doc. #20-2 (Milhaven Estates); Doc. #20-3 (Love Estates); Doc. #20-4 (Presidential Estates); Doc. #20-5 (Maplewood)]. This satisfies the first regulatory notice requirement.

---

[3] According to the Louisiana Secretary of State Commercial Division Corporations Database, Pruett is also the Director of Louisiana Land & Water (http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta=34774080D) and LWC Management (http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta=34774057D). In addition, Pruett is the Secretary of UDS Management (http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta=34339872D ) and UDS Corp. (http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta).

Second, "[i]f the alleged violator is a corporation, a copy of such notice also shall be mailed to the registered agent, if any, of such corporation in the State in which such violation is alleged to have occurred." 40 C.F.R. § 135.2(a)(1). Here, Pruett is the registered agent for each of the defendant corporations.[4] Thus, by sending notice to Pruett via certified mail, LEAN satisfied this second regulatory notice requirement as well.

Here, the defendants concede that "the plaintiff sent the notice required by the . . . provision[]" but contend that LEAN failed to send notice to

1. Defendant Jeffrey Pruett, as an individual defendant, concerning any of the wastewater treatment systems;

2. Defendant LWC Management concerning the allegations at the Presidential and Tanglewood wastewater treatment systems; and

3. Defendant UDS Management concerning allegations at the Presidential Estates, Tanglewood, Milhaven, or Love wastewater treatment systems.

[Doc. #81, p.7]. The defendants also maintain that no notice has ever been sent to defendants Bayou Utilities or Utility Data Service. In this regard, the defendants argue that the plaintiffs cannot obtain judgments against Pruett (in his individual capacity), Bayou Utilities, or Utility Data Service for any CWA violation.[5] Moreover, the defendants argue the same with regard to LWC and UDS Management for the facilities for which they claim no notice was sent.

---

[4] The Louisiana Secretary of State Commercial Division Corporations Database contains this information: http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta= 34774057D (LWC); http://www400.sos.louisiana.gov/cgibin?rqstyp=crpdtlC&rqsdta= 34774080D (Louisiana Land and Water); http://www400.sos.louisiana.gov/cgibin?rqstyp= crpdtlC&rqsdta=34339872D (UDS Management); http://www400.sos.louisiana.gov/cgibin? rqstyp=crpdtlC&rqsdta=23400730D (Bayou); http://www400.sos.louisiana.gov/cgibin?rqstyp= crpdtlC&rqsdta=34251606D (UDS Corp.).

[5] The defendants raise this argument notwithstanding the fact that the instant motion seeks summary judgment against Louisiana Land and Water and LWC only.

15

Apparently the defendants' contention is that the notices had to be sent to Pruett at his home, rather than at the facilities, and had to list each of the defendant corporations in the address line.

The defendants' arguments concerning the notice requirements clash with a plain reading of the regulation as well as the interpretation of the courts. As noted above, the "owner," "managing agent," and "registered agent" of each facility or corporation received notice of the action via certified mail. Hence, there does not appear to have been any deviation from the statutory and regulatory notice requirements. While the defendants are correct that "compliance with the 60-day notice provision is a mandatory, not optional condition precedent for suit," Hallstrom v. Tillamook County, 493 U.S. 20 (1989), "[c]ourts have held that minor, hypertechnical deviation from the regulation does not render notice ineffectual." Lockett v. EPA, 176 F. Supp. 2d 628, 635 (E.D.La. 2001), affirmed by 319 F.3d 678 (5th Cir. 2003) (citing cases). "[T]he purpose of notice to the alleged violator is to give it an opportunity to bring itself into complete compliance with the [CWA] and thus likewise render unnecessary a citizen suit." Gwaltney of Smithfield v. Chesapeake Bay Found., 484 U.S. 49, 60 (1987). Any argument that any of the defendants did not receive notice with regard to one or more facilities is meritless; the companies' owner and registered agent, as well as the facilities' general manager, received notice via certified mail pertaining to each of the facilities. Thus, each defendant had actual notice and the opportunity to bring its facility into compliance with the CWA. The failure to send the notice to Pruett at his home or to list the name of any corporation in the address line, if they are deficiencies, are insufficient to warrant dismissal.

### E. Discharge Monitoring Reports

LEAN alleges that the defendants failed to publicly file Discharge Monitoring Reports

16

("DMRs") multiple times for each facility. In support of this allegation, LEAN has submitted the affidavit of Orr. [Doc. #78 - Ex.11]. Orr asserts that she reviewed the DMRs and the permits. Orr further asserts that "[f]or some months, as indicated on the attached summary table, there were no discharge monitoring reports in the DEQ records." [Doc. #78 - Ex.11, ¶ V].

In response, the defendants have submitted copies of DMRs they contend they timely filed. [Doc. #81, Ex. D1-F1; Ex. I1-M2]. The defendants contend that "all [DMRs] for the wastewater systems in this litigation have been timely filed by the defendants with the Louisiana Department of Environmental Quality." [Doc. #81, p.19 (emphasis removed)]. The court will consider each facility separately as to this issue. See generally FED. R. CIV. P. 56(d)(1) ("If summary judgment is not rendered on the whole action, the court should, to the extent practicable, determine what material facts are not genuinely at issue.").

### 1. DMRs for the Love Estates Facility

LEAN contends that "[n]o DMRs were submitted for the Love Estates sewage facility for the time period from June 2003 to December 2007." [Doc. #78-2, ¶ 14]. The defendants contend that all of the DMRs for the facility were timely filed. The defendants have attached DMRs for the Love Estates Facility for July 2003 and November 2003 through December 2007. [Doc. #81, Ex. D1-D12]. No DMRs for June 2003 or August through October 2003 were attached. Consequently, there is a genuine issue of material fact as to whether the defendants properly filed the DMRs for the Love Estates Facility for July 2003 and November 2003 through December 2007. On the other hand, since the defendants have presented no countervailing evidence with regard to June 2003 or August through October 2003, the court finds that no DMRs were filed for the Love Estates Facility for those months.

17

### 2. DMRs for the Maplewood Facility

LEAN contends that "[n]o DMRs for the Maplewood facility were submitted for October, November and December of 2003 and for January, February, and March of 2005." [Doc. #78-2, ¶ 7]. A review of the record reveals that the defendants have submitted copies of what they assert are the DMRs for the Maplewood facility for each of those months. [Doc. #81, Ex. E1-E2]. Consequently, there is a genuine issue of material fact as to whether the defendants properly filed the DMRs for the Maplewood facility for October, November and December of 2003 and for January, February, and March of 2005.

### 3. DMRs for the Milhaven Estates Facility

LEAN contends that "[n]o DMRs were submitted for the Milhaven Estates sewage facility the period from June 2003 to December 2007." [Doc. #78-2, ¶ 17]. A review of the record reveals that the defendants have submitted copies of what they assert are the DMRs for the Milhaven Estates facility for each of those months with the exception of June 2003. [Doc. #81, Ex. F1]. Consequently, there is a genuine issue of material fact as to whether the defendants properly filed the DMRs for the Milhaven Estates Facility for July 2003 through December 2007. On the other hand, since the defendants have presented no countervailing evidence with regard to June 2003, the court finds that no DMRs were filed for the Milhaven Estates Facility for that month.

### 4. DMRs for the Presidential Estates Facility

LEAN contends that "[n]o DMRs were submitted for the Presidential Estates facility for the period from April 2004 to December 2007." [Doc. #78-2, ¶ 20]. A review of the record reveals that the defendants have submitted copies of what they assert are the DMRs for the

18

Presidential Estates facility for each of those months. [Doc. #81, Ex. L1-L2]. Consequently, there is a genuine issue of material fact as to whether the defendants properly filed the DMRs for the Presidential Estates facility for the period from April 2004 to December 2007.

### 5. DMRs for the Tanglewood Estates Facility

LEAN contends that "[n]o DMRs for the Tanglewood Estates facility were submitted for October, November and December of 2003 and for April, May, and June of 2004." [Doc. #78-2, ¶ 11]. A review of the record reveals that the defendants have submitted copies of what they assert are the DMRs for the Tanglewood Estates facility for each of those months. [Doc. #81, Ex. G1-G2]. Consequently, there is a genuine issue of material fact as to whether the defendants properly filed the DMRs for the Tanglewood Estates facility for for October, November and December of 2003 and for April, May, and June of 2004.

## III. Conclusion

Because there remains a genuine issue of material fact as to whether any member of LEAN has suffered an injury which is fairly traceable to the defendants' discharge and reporting violations, the motion for summary judgment is DENIED. However, as the court has explained above, there are no genuine issues of material fact regarding the following: (i) the defendants have discharged pollutants in excess of the limits in the permits; (ii) each defendant received actual notice of the alleged violations and had the opportunity to bring the facilities into compliance; and (iii) the defendants did not timely file the Discharge Monitoring Reports listed above. Consequently, the primary issue to be resolved at trial will be whether LEAN members have an interest in the waterways affected by the defendants' discharges, whether the members have suffered an injury with regard to that interest, and whether the injury is fairly traceable to

the defendants' discharges.

       MONROE, LOUISIANA, this \_\_\_11\_\_\_ day of \_\_August\_\_, 2008.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE